[950 NE2d 91, 926 NYS2d 355]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LUIS FELICIANO, Appellant.

Argued March 24, 2011; decided May 5, 2011

## POINTS OF COUNSEL

*Matalon Shweky Elman PLLC*, New York City (*Joseph Lee Matalon* and *Jeremy C. Bates* of counsel), for appellant. I. Counsel's failure to argue that a five-year delay violated Luis Feliciano's right to a prompt hearing deprived Feliciano of meaningful representation. (*People v Jackson*, 153 AD2d 977; *People v Carncross*, 59 AD3d 1112, 14 NY3d 319; *Black v Romano*, 471 US 606; *Gagnon v Scarpelli*, 411 US 778; *Strickland v Washington*, 466 US 668; *Mayo v Henderson*, 13 F3d 528; *Forbes v United States*, 574 F3d 101; *People v Caban*, 5 NY3d 143; *People v Stultz*, 2 NY3d 277; *People v Benevento*, 91 NY2d 708.) II. Luis Feliciano's federal right to counsel and his due process rights have also been violated. (*Strickland v Washington*, 466 US 668; *Henry v Poole*, 409 F3d 48; *People v Sawinski*, 294 AD2d 667; *People v Oskroba*, 305 NY 113; *Black v Romano*, 471 US 606; *Gagnon v Scarpelli*, 411 US 778; *United States v Deutsch*, 100 F3d 943.)

*Danielle D. McIntosh, District Attorney*, Catskill, for respondent. I. Appellant was not denied meaningful representation because the prompt hearing argument was meritless in light of the extradition matter. (*People v Baldi*, 54 NY2d 137; *People v Miles*, 36 AD3d 1021; *People v Stultz*, 2 NY3d 277; *People v Borrell*, 12 NY3d 365; *People v Jackson*, 4 AD3d 848; *People v Turner*, 5 NY3d 476; *Cuyler v Adams*, 449 US 433; *People ex rel. Capalongo v Howard*, 87 AD2d 242; *Carchman v Nash*, 473 US 716; *People v Ball*, 68 AD3d 1148.) II. Appellant received effective assistance of counsel and due process under the federal

*standard. (Strickland v Washington*, 466 US 668; *People v Ben-
evento*, 91 NY2d 708; *People v Ford*, 86 NY2d 397; *People v Hor-
vath*, 37 AD3d 33; *Gagnon v Scarpelli*, 411 US 778; *People ex
rel. Schouenborg v Flood*, 94 AD2d 751; *Moody v Daggett*, 429
US 78.)

## OPINION OF THE COURT

READ, J.

On April 14, 1992, County Court in Greene County imposed a
split sentence of six months in jail and five years of probation
on defendant Luis Feliciano in exchange for a plea of guilty to a
felony drug charge. After July 1, 1992, however, he stopped ap-
pearing for mandated weekly appointments with his probation
officer, who received a report that defendant had fled New York
for Puerto Rico. The probation officer investigated this informa-
tion and ultimately filed a violation of probation (VOP)
complaint with County Court on July 20, 1992, alleging that de-
fendant had "absconded . . . by leaving for Puerto Rico without
[his probation officer's] permission on 7/4/92." County Court
declared defendant to be delinquent and issued an arrest war-
rant that same day (*see* CPL 410.30 [declaration of delinquen-
cy], 410.40 [2] [warrant]; Penal Law § 65.15 [2] [providing that
declaration of delinquency tolls probationary sentence until dis-
position of VOP complaint]).

In 2000, defendant was arrested in Pennsylvania for shooting
his pregnant wife with a rifle and killing her. He was convicted
in 2001 of involuntary manslaughter and a related weapon of-
fense, and sentenced to consecutive prison terms of 2½ to 5
years and 2 to 4 years, respectively, for these crimes. The
Pennsylvania convictions caused the probation officer to
discover defendant's whereabouts during the course of a periodic
search of criminal records. On February 14, 2002, he lodged a
detainer[1] with the Pennsylvania prison where defendant was
incarcerated.

Defendant wrote County Court on July 8, 2002, declaring
that he was "available for disposition" of the pending VOP
complaint, and warning that he "intend[ed] to have [the]

---

1. The United States Supreme Court has defined a detainer as "a request
filed by a criminal justice agency with the institution in which a prisoner is
incarcerated, asking the institution either to hold the prisoner for the agency
or to notify the agency when release of the prisoner is imminent" (*Carchman
v Nash*, 473 US 716, 719 [1985]).

charges dismissed" if they were not "disposed in a timely manner . . . consistent with the laws governing speedy trial in New York." Defendant added that the detainer would "hamper any attempts that [he] might . . . make for pre-release programming . . . in Pennsylvania, thus making it necessary for [him] to have it dealt with as soon as possible."

On July 19, 2002, a week after he received defendant's letter, County Court issued a memorandum to the Greene County probation department, district attorney and public defender, attaching the letter. The judge noted that a VOP hearing was not subject to statutory speedy trial rules; however, citing CPL 410.30, he scheduled an appearance for August 20, 2002 "in the interest of taking prompt, reasonable and appropriate action to cause defendant to appear and answer the pending Declaration of Delinquency" (internal quotation marks omitted). County Court asked the district attorney to "take appropriate action to ensure Defendant's presence," and instructed everyone to be prepared for a revocation hearing on August 20th, if necessary.

On July 24, 2002, the district attorney informed County Court that arranging for defendant's extradition would be difficult, if not impossible, to accomplish: the district attorney had spoken with the State's extradition coordinator, who told him there was no "normal mechanism" to obtain defendant's attendance in County Court because the Interstate Agreement on Detainers was "inapplicable." She advised that "normally extraditions would take place when a defendant [had] completed his prison sentence outside of New York State whereupon he would be made available for pickup and transport to a New York State Court."

As related by the district attorney, the extradition coordinator went on to say that, having handled over 3,000 cases in her five-year tenure, she had "never attempted an extradition of an out-of-state prisoner who [had] not completed his sentence to respond to probation violation charges in New York State," and that the "only way [she] could think of" to do this was an agreement between the Governors of New York and Pennsylvania. She suggested that "special circumstances would have to exist and be alleged" and that the Governor's Counsel "would be questioning" why an exception to the usual practice should be made. She also observed that the Governor's decision whether to proceed in this fashion "would be totally discretionary," and that New York "would have no control over whether the Pennsylvania Governor would exercise his discretion in entering into such an agreement."

Finally, the district attorney pointed out to County Court that waiting to extradite defendant would save the County the expense of a round trip. In light of the complications presented by defendant's out-of-state incarceration, the district attorney "request[ed] that the defendant's extradition . . . take place at the conclusion of his service of his Pennsylvania sentence rather than at the present time."

One day later, the judge canceled the August 20th hearing in view of "the difficulties involved in attempting to produce [defendant] . . . , as well as the uncertainty as to whether such arrangement would be approved by the Governors of both Pennsylvania and New York." He determined that the VOP complaint would be "dealt with . . . at some time in the future upon [defendant's] release from the Pennsylvania Correctional System."

On January 14, 2003, defendant wrote County Court, imploring the judge to facilitate disposition of the VOP complaint. On January 21, 2003, the judge responded that he had "declined to schedule an appearance on the pending [VOP] prior to [defendant's] release from the Pennsylvania Correctional System" because of "uncertainty as to whether an extradition arrangement would even be approved by the Governors of Pennsylvania and New York," and that there was "no reason to deviate from this prior determination."

On June 2, 2003, defendant filed a pro se motion in County Court. He complained about the risk of double jeopardy; he conceded that he was "guilty on this [VOP]," and asked the court "to fix this legal matter." County Court held a hearing on June 24, 2003, which was attended by the public defender, the district attorney and defendant's probation officer. When the judge asked if there was any "consensus between the People and the defense counsel in regard to the issues . . . before the Court," the public defender responded that

> "for due process purposes, the defendant ought to be brought back as expeditiously as possible for the purposes of addressing the issue of the [VOP] and closing that case once and for all, as opposed to allowing the case to linger for years until some day the defendant shall complete a prison term in the State of Pennsylvania."

The district attorney indicated that the People opposed defendant's production "at this time"; he suggested that the

matter was not "ripe" until defendant was about to be released from the Pennsylvania prison. When the judge asked for a specific date, the probation officer replied that defendant's earliest and maximum release dates in Pennsylvania were January 11, 2005 and July 11, 2009, respectively. The probation officer also observed that "one of the other concerns" in retrieving defendant for a VOP hearing before he completed his prison term in Pennsylvania was the "procedural nightmare and unnecessary travel."

At the end of the hearing, the judge again concluded that defendant should be returned "at the finish of his Pennsylvania sentence." He issued a written decision and order to this effect, dated June 27, 2003, in which he also rejected what he understood to be defendant's argument that "double jeopardy prohibit[ed] [County] Court from sentencing him to a prison term for the same crime for which he was previously sentenced to a term of probation."

In advance of defendant's scheduled release from prison to a halfway house, Pennsylvania officials notified the probation officer and arrangements were made to return defendant to Greene County. On May 24, 2007, the warrant was executed and a hearing was held in County Court, after which defendant was committed to the sheriff's custody without bail (*see* CPL 410.60 [reasonable cause hearing]). At this hearing, defense counsel informed the judge that his client was "requesting that the time he served in prison in Pennsylvania [be] concurrent to the offense here in New York." Both the probation officer and the district attorney made clear that this proposal was unacceptable, and that the People would seek defendant's incarceration for 15 years. On May 24, 2007, the probation officer also amended the VOP complaint by adding a second count relating to the Pennsylvania crimes, and on May 29, 2007, defendant was arraigned again.

A revocation hearing was held on May 31, 2007; at its conclusion, County Court found that defendant had violated several of the general conditions of his probation by absconding and by committing the crimes in Pennsylvania (*see* CPL 410.70 [probation-revocation hearing]). On June 6, 2007, the judge revoked the probation portion of the sentence imposed on defendant in 1992, and resentenced him to an indeterminate term of 5 to 15 years in prison, which was the sentence specified by the Penal Law at the time defendant committed the drug felony to which he pleaded guilty (*see* CPL 410.70 [5]). Defendant

appealed, and the Appellate Division affirmed (54 AD3d 1131 [3d Dept 2008]).

Defendant then sought postconviction relief by way of two CPL 440.20 motions to set aside his sentence, both brought pro se. In his first motion, made in November 2008, defendant contended that County Court lost jurisdiction to adjudicate him in violation of probation because of an unexplained 15-year delay in producing him to answer the declaration of delinquency, citing *People v Horvath* (37 AD3d 33 [2d Dept 2006]). In a decision and order dated January 21, 2009, County Court denied the motion in its entirety; specifically, the judge ruled that defendant's objection to timeliness was unpreserved because it was not raised at the VOP hearing. On April 6, 2009, the Appellate Division denied defendant permission to appeal (2009 NY Slip Op 69279[U] [3d Dept 2009]).

In his second CPL 440.20 motion, made in March 2009, defendant raised an ineffective assistance of counsel claim under state and federal law on account of defense counsel's failure to raise the issue of delay at the VOP hearing. On May 4, 2009, County Court denied this motion, ruling in particular that defendant's ineffective assistance claim was "the proper subject of [his] direct appeal, not a CPL [article] 440 motion." On June 30, 2009, the Appellate Division denied defendant permission to appeal (2009 NY Slip Op 77128[U] [3d Dept 2009]).

In September 2009, defendant pro se applied to the Appellate Division for a writ of error coram nobis. He claimed that appellate counsel's representation was deficient because he did not fault defense counsel for failing to argue at the VOP hearing that "the six[-]year delay by the DA in moving to adjudicate the [VOP] amounted to a loss of jurisdiction [such that] the Court below would have been statutorily compelled to dismiss the violation and the case." The Appellate Division denied the application (2009 NY Slip Op 89246[U] [3d Dept 2009]). A Judge of this Court subsequently granted defendant leave to appeal (14 NY3d 840 [2010]), and we now affirm.

## I.

In *People v Baldi* (54 NY2d 137, 146-147 [1981]), we created a standard of "meaningful representation" to evaluate the effectiveness of trial counsel, where the "prejudice component focuses on the 'fairness of the process as a whole rather than its particular impact on the outcome of the case' " (*People v Caban*, 5 NY3d 143, 156 [2005], quoting *People v Benevento*, 91 NY2d

708, 714 [1998]). In *People v Stultz* (2 NY3d 277 [2004]), we adopted "meaningful representation" as the measure of effective assistance of appellate counsel, commenting that it would be "inapt to have one standard for trials and another for appeals" and that "[a]ppellate courts are uniquely suited to evaluate what is meaningful in their own arena" (*id.* at 284).

*Stultz* characterized appellate advocacy as meaningful so long as it "reflect[ed] a competent grasp of the facts, the law and appellate procedure, supported by appropriate authority and argument" (*id.* at 285). And although "in general, the issue is whether counsel's performance *viewed in totality* amounts to meaningful representation," we have acknowledged that there are "rare" cases where "a single failing in an otherwise competent performance is so egregious and prejudicial as to deprive a defendant of his constitutional right" (*People v Turner*, 5 NY3d 476, 480 [2005] [emphasis added; internal quotation marks omitted]).

*Turner* was such a "rare" case. There, trial counsel neglected to advance "[a] clear-cut and completely dispositive" statute of limitations defense, which "no reasonable defense lawyer could have found . . . so weak as to be not worth raising" (*id.* at 481, 483). We concluded that this deficiency in trial counsel's performance "should have been apparent to any reasonable appellate counsel, and should have prompted that counsel to make an ineffective assistance argument" (*id.* at 483).

Here, County Court postponed the VOP hearing until defendant was released from prison in Pennsylvania, as requested by the district attorney. Defendant maintains that the resulting five-year delay in adjudicating the VOP complaint violated his statutory right under CPL article 410 (or, alternatively, his federal due process right) to a prompt hearing and thereby divested County Court of jurisdiction to revoke his probation. Defendant's trial counsel did not make these arguments—which defendant considers to be "clear-cut and completely dispositive" à la *Turner*—at the VOP hearing, and his appellate attorney did not point out the omission to the Appellate Division. The outcome of defendant's application for a writ of error coram nobis thus depends on the soundness of his statutory and constitutional arguments.

## II.

CPL 410.30 provides that, upon reasonable cause to believe that a defendant has violated a condition of a sentence of probation, the court may declare the defendant delinquent and file a

written declaration of delinquency. Upon such filing, "the court *must promptly take reasonable and appropriate action* to cause the defendant to appear before it for the purpose of enabling the court to make a final determination with respect to the alleged delinquency" (*id.* [emphasis added]). Concomitantly, CPL 410.40 (2) mandates that a warrant issued by the court in connection with a VOP must direct the defendant to be taken into custody and brought before the court *"without unnecessary delay"* (emphasis added); and CPL 410.70 (1) entitles a defendant to a hearing on the alleged VOP *"promptly* after the court has filed a declaration of delinquency" (emphasis added).

The Appellate Division examined these provisions in *Horvath*. There, Supreme Court in Kings County filed a declaration of delinquency against the defendant for allegedly violating the terms of a probationary sentence imposed upon her after she pleaded guilty to third-degree grand larceny. A few months later, the defendant was arrested on additional larceny charges in New York County; she was subsequently convicted and sentenced to 3 to 6 years in prison on these charges. Prior to sentencing, the New York City Department of Probation (City Probation Department) prepared a presentence report, which noted that the defendant was on probation for a prior felony conviction. Following sentencing, the defendant was transferred to state prison; she did not appear in Supreme Court in Kings County to answer the declaration of delinquency until roughly 20 months after she began serving her prison sentence. The defendant argued that because she was not promptly produced on the declaration of delinquency, the court lacked jurisdiction to adjudicate her in violation of probation.

The Appellate Division agreed, first noting that although constitutional and statutory speedy trial guarantees and specific statutory deadlines were not implicated, "an allegation that a probationer has violated probation may result in a serious deprivation, including the loss of liberty" (37 AD3d at 37). Consequently,

> "the meaning of the command of CPL 410.30 that the court 'promptly take reasonable and appropriate action to cause the defendant to appear before it,' as well as the requirement of CPL 410.70 (1) that a hearing be held 'promptly' after the filing of the declaration of delinquency, must be informed by

the basic due process requirement that the violation of probation hearing not be unreasonably delayed" (*id.*).

The court considered four factors—the length of the delay, the reason for the delay, whether the probationer contributed to the delay and demonstrable prejudice to the probationer because of the delay—relevant to an evaluation of whether the timeliness requirements of CPL article 410 had been met, remarking that "[o]rdinarily, no single factor, standing alone, is either necessary or sufficient to warrant relief" (*id.* at 38). The Appellate Division then concluded that the delay in this case was substantial and unexplained and not in any way attributable to anything done by the defendant, observing that "the [City] Probation Department had prepared a report concerning [the defendant] which noted that she was on probation," and she "was available to the Probation Department to be produced on the warrant throughout the period of her incarceration" (*id.* at 38). Finally, while "not prepared to say" that the defendant suffered no prejudice on account of the delay, the court held that CPL article 410 "does not demand a showing of prejudice as a sine qua non for relief," as the City Probation Department argued. The court called this a reasonable "legislative choice" because "[t]he filing of a declaration of delinquency tolls the period of probation, thereby, in effect, extending the sentence originally imposed" (*id.* at 39, citing Penal Law § 65.15 [2]). "On this record," the Appellate Division held that "the balance [of the factors] weigh[ed] clearly in [the defendant's] favor and therefore the Supreme Court lost jurisdiction to adjudicate her in violation of probation" (*id.*).

According to defendant, "*Horvath* thus stands for the rule that if a probationer is available to the Probation Department by reason of being incarcerated, then the statutory right to a prompt hearing attaches, and the violation of that right causes the court to lose jurisdiction." This formulation begs the question of what it means for a defendant to be "available . . . by reason of being incarcerated." A probationer subject to a declaration of delinquency and incarcerated in a New York prison may readily be transported to a New York court for an appearance at a VOP hearing; this is why the lengthy delay in *Horvath* was unexplained and ultimately, in the Appellate Division's view, inexcusable. The extradition of such a probationer from an out-of-state prison to New York for an appearance in a New York court is quite another matter.

But defendant also relies on our decision in *People v Winfrey* (20 NY2d 138 [1967]). In April 1958, a warrant was issued for the defendant's arrest for second-degree forgery and petit larceny. The defendant was soon thereafter incarcerated in Alabama for a probation violation. The New York prosecutor lodged a detainer with the prison authorities in Alabama in July 1958, but made "no effort . . . to obtain his presence in New York" (*id.* at 140). The defendant was indicted on the forgery and petit larceny charges in January 1963; he was returned to New York for prosecution in October 1963, upon his release from prison in Alabama. The defendant moved to dismiss the indictment for failure to prosecute.

The People offered the defendant's Alabama imprisonment as justification for the delay, and argued that because Alabama was not then a party to the Interstate Agreement on Detainers, "a request for [the defendant's] release before his sentence was completed would have had a dubious result" (*id.* at 142). We observed that the People's argument "overlook[ed] the fact that Alabama . . . [made] provision for transfer of defendants to other States in the discretion of the Governor" (*id.*). Further, it was

> "a relatively simple matter to request the Governor of a sister State to turn over a prisoner; and there is no contention that if such a request [was] made and rejected a delay in bringing the prisoner to trial in New York occasioned by his foreign imprisonment would be unreasonable. The point [was] that in this case no effort of any kind was made" (*id.*).

We decided that the delay deprived the defendant of due process of law and so reversed the Appellate Division's order and granted the defendant's motion to dismiss the indictment, observing that

> "once having instituted the prosecution by detainer warrant, indictment or other initiatory process, [the People] have the obligation of advancing it unless there is reasonable ground for delay. Refusal by another jurisdiction to surrender the defendant would, of course, be an excuse. All that the People would have to do is make the request, sincerely, for the surrender—a letter would do" (*id.* at 144).

Defendant takes *Winfrey* and, to a lesser extent our decision in *People v Romeo* (12 NY3d 51 [2009]),[2] to stand for the proposition that the County was, at a minimum, required to make a prompt request of the State's extradition coordinator to arrange for defendant's presence at a VOP hearing in New York once defendant wrote County Court in July 2002, asking to appear and answer the VOP complaint. Courts, however, have traditionally treated extradition for purposes of criminal prosecution, as in *Winfrey* and *Romeo*, as matters of far greater urgency and constitutional dimension than probation revocation proceedings. The United States Supreme Court's decisions in *Carchman* and *Moody v Daggett* (429 US 78 [1976]) illustrate this point.

In *Carchman*, the Supreme Court held that the Interstate Agreement on Detainers, designed to encourage jurisdictions to cooperate with one another in resolving outstanding detainers, does not apply to a detainer for a probation-violation warrant. This is so because a "probation-violation charge is not a detainer based on 'any untried indictment, information or complaint,' within the meaning of" the language in article III of the Agreement (*Carchman*, 473 US at 726). Article III sets up a procedure whereby a prisoner incarcerated in one party state (the sending state) may demand the speedy disposition of "any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner" by another party state (the receiving state) (*see* CPL 580.20). Article IV sets up a corollary procedure whereby an "appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available" (*id.*).

In reaching its decision in *Carchman*, the Court stressed that the statute's broader purposes with respect to criminal-charge detainers did not generally apply in the context of probation-violation detainers. First, there was less danger of unsubstantiated charges since the probation-violation detainer was often

**2.** The defendant in *Romeo* fatally shot a man in New York before absconding to Canada and fatally shooting a second victim there. We held that the 12-year postindictment delay, occasioned by the People's decision to defer prosecution and allow the defendant to be extradited to Canada for prosecution there first, violated the defendant's speedy trial rights. We faulted the People for failing to file an extradition warrant or make other diligent efforts to bring the defendant to trial promptly.

based on the prisoner's commission of the crimes resulting in his conviction and incarceration (*Carchman*, 473 US at 730-731). Second, there were fewer uncertainties in the likelihood of receiving an additional sentence—i.e., "[s]ince the probation revocation [was] based on commission of a crime serious enough to warrant incarceration in the sending State, the probationer no doubt often . . . [would] be sentenced to serve the full term of his suspended sentence" (*id.* at 732). Finally, the possibility that a long delay would impair the prisoner's ability to defend himself was "unlikely to be strongly implicated in the probation-violation detainer context" (*id.* at 733).

The Court commented that it had "never held . . . that a prisoner subject to a probation-violation detainer has a constitutional right to a speedy probation-revocation hearing," citing *Moody* (*id.* at 731 n 10). Finally, although the Court recognized that an individual prisoner might have a legitimate interest in prompt disposition of a probation-violation charge, it concluded that

> "[n]evertheless, . . . the purposes of the Agreement [were] significantly less advanced by application . . . to probation-violation detainers than by application . . . to criminal-charge detainers"; and "[w]hether those purposes would be advanced sufficiently by application of Art. III to probation-violation detainers to outweigh the administrative costs,[3] and, more generally, whether the procedures of Art. III [were] the most appropriate means of disposing of probation-violation detainers, [were] questions of legislative judgment" best left to the parties to the Agreement (*id.* at 734).

*Moody* involved a challenge to the United States Board of Parole's decision to delay the execution of a parole-violation warrant until the alleged violator had served the custodial portion of an intervening prison sentence. While on federal parole, the parolee was convicted of two more federal offenses for which

---

3. A number of states filed an amici curiae brief in which they argued that "expanding the scope of . . . the Agreement to include detainers for violation of probationary sentences," would "create[ ] a substantial obligation on the States. Since there is no constitutional obligation on the States to move speedily to revoke probation [citing *Moody*], the States' obligations are those knowingly accepted . . . in signing the agreement" (1984 WL 566114, at *16-17).

he was incarcerated in a federal prison. The Board issued a parole-violation warrant, which was lodged as a detainer in the federal prison. Although the parolee requested speedy execution of the outstanding warrant, the Board allowed the warrant to remain unexecuted until the parolee had completed serving the new federal sentences.

The Supreme Court endorsed this approach, concluding that due process did not mandate a hearing promptly upon issuance of the parole-violation warrant and the detainer. The Court reasoned that the outstanding warrant did not deprive the parolee of any protected liberty interest: the possibility of future incarceration if a revocation was eventually ordered was too uncertain to constitute a liberty interest; the parolee's claim that the detainer made him ineligible for certain prison programs and caused a less desirable classification was insufficient to invoke due process; the unexecuted warrant did not deprive the parolee of the chance of concurrent sentences because the United States Parole Commission was authorized by statute to revoke parole and grant, retroactively, credit for time already served in prison for crimes committed while on parole; and the parolee made no claim that any evidence in his case would be "vitiated by delay" (*Moody*, 429 US at 88 n 9).

The Court also stated that "there [was] a practical aspect to consider" in cases where "the parolee admits or has been convicted of an offense plainly constituting a parole violation" (*id.* at 89). Specifically, the alleged parole violator might benefit from a later hearing because "a decision to revoke parole would often be foreordained" if the hearing was held immediately after imprisonment, while deferring the hearing until expiration of the parolee's intervening sentence would yield more relevant and accurate information to predict whether release was justified (*id.*). Although *Moody* is arguably distinguishable from cases involving more than one jurisdiction, post-*Moody* decisions have generally interpreted it to mean that states are not constitutionally obligated to execute detainers lodged out of state against parole or probation violators before their release from prison (*see generally* 2 N. Cohen, The Law of Probation and Parole §§ 24:10, 24:11, 24:12 [2d ed 1999]).[4]

---

4. Even though *Moody* involved a federal prisoner attacking a federal detainer, several states filed amicus curiae briefs, apparently sensing that the decision might affect their extradition practices with respect to alleged parole and probation violators. These amici emphasized that the Court's decision

## III.

As the discussion of the relevant statutes and cases shows, the arguments that defendant asserts trial counsel should have advanced at the VOP hearing are not so strong that "no reasonable defense lawyer could have found [them] . . . to be not worth raising" (*Turner*, 5 NY3d at 483). They are, in fact, novel and call for an extension of or change in—not an application of—existing law. As a result, there was no reason for appellate counsel to make an ineffective assistance argument. As we noted in *People v Borrell* (12 NY3d 365, 369 [2009]), "[c]ounsel [is] not ineffective for failing to raise an issue of . . . uncertain efficacy on the appeal."

Accordingly, the order of the Appellate Division should be affirmed.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, SMITH, PIGOTT and JONES concur.

Order affirmed.

---

involving the scope of due process should consider the administrative burdens imposed on them by available alternatives. For example, the Commonwealth of Virginia argued that "[t]o require that a final revocation hearing be held while [the alleged violator] is still incarcerated in a foreign jurisdiction places an undue burden upon the paroling States and tends to overlook administrative realities" (1976 WL 181202, at *8). Essentially, the states were worried about the extra costs involved, just as Greene County was in this case.