OPINION OF THE COURT
Marcy L. Kahn, J.
On September 28, 1988, defendant Florentino Burgos was convicted by plea of guilty of attempted criminal sale of a controlled substance in the third degree (Penal Law §§ 110.00/ 220.39 [1]) before another justice of this court. On November 14, 1988, he received the promised sentence of time served and five years’ probation. He now moves to vacate his judgment of conviction pursuant to Criminal Procedure Law § 440.10 (1) (h) on the ground that he received ineffective assistance of counsel at the time of his plea. Specifically, defendant alleges that the failure of his trial counsel to advise him that his conviction would subject him to automatic deportation pursuant to 8 USC § 1227 (a) (2) (B) (i) (deportability for controlled substance offenses) violated his right to effective assistance of counsel under Padilla v Kentucky (559 US —, 130 S Ct 1473 [2010]). The People oppose the motion.
By order dated September 9, 2011 (Burgos I), this court directed that a hearing be held pursuant to CPL 440.30 (5) concerning the factual issues presented by the motion. On December 1, 2011, this court issued a written decision and order explaining its order in Burgos I (Burgos II). On January 13 and 20, 2012, and February 17, 2012, this court held that hearing. On April 10, 2012, defendant submitted a written summa *396 tion of his arguments on this motion (affirmation of Andrew Friedman, Esq., dated Apr. 6, 2012 [closing summation]) and, on April 27, 2012, the People submitted their response in opposition (affirmation of Jonathan Shih, Esq., dated Apr. 27, 2012 [People’s response to defendant’s posthearing motion]). On June 19, 2012, the parties were invited to file supplemental submissions regarding the effect of the recent decision in People v Picea (97 AD3d 170 [2d Dept, June 6, 2012]), on defendant’s current Padilla claim. On June 21, 2012, the People submitted a letter to the court in response to that invitation. This decision and order contains the court’s findings of fact and legal conclusions following the hearing and its decision granting the motion.
I. The Hearing[1]
At the hearing, the defense called defendant, who testified on January 13 and 20, 2012, and defendant’s plea counsel, Victor Daly-Rivera, Esq., who testified on February 17, 2012. I found both witnesses credible. In defendant’s case, I credit him because his criminal prosecution was a unique experience for him, and because he gave a detailed recitation of the facts in support of his claim of actual innocence.[2] While defendant’s testimony was at some points unclear and seemingly internally contradictory, and despite the dearth of significant largely documentary evidence, a coherent and logical narrative nonetheless emerged. In Mr. Daly-Rivera’s case, I credit him as an officer of the court and because of his years of experience in criminal law. He lacked any specific memory either of the case or of his representation of defendant, however.
II. Findings of Fact
A. Defendant’s Immigration History
The following facts emerge from defendant’s testimony at the hearing. Defendant Burgos was born in 1964 and grew up in the Dominican Republic in “a very poor family . . . liv[ing] all *397 together in a very small [one-room] house.” (Tr, Jan. 13, 2012, at 8.) In 1984, he left the Dominican Republic, traveling by airplane to Mexico. Once there, he hired a driver to take him through the mountains and across the United States border to San Antonio, Texas. From Texas, he then boarded a domestic flight to New York City. Thus, he entered the United States illegally, without a visa and without inspection or parole by the Immigration and Naturalization Service (INS) or United States customs officials.
In 1984 or 1985, defendant married his first wife, who was then a United States citizen. He then learned that he was eligible for an adjustment of his immigration status to that of a lawful permanent resident (LPR) based upon his marriage to a United States citizen. (Id. at 56; see 8 USC § 1153 [a] [2] [A] [providing for allocation of a certain number of immigrant visas to spouses of LPRs].) Accordingly, he submitted an application to the INS. He then learned from an immigration attorney that in order to further his application to legalize his status, he would have to leave the United States and go to Mexico.
Sometime in 1986, after having waited approximately six months for an appointment to see Mexican immigration authorities, defendant flew from the United States to Mexico. After arriving in Ciudad Juarez, he was interviewed by a Mexican immigration official and obtained a temporary United States visa, which was issued for the purpose of meeting with American immigration officials in this country. One week later, defendant flew back to the United States. He was processed into the United States by immigration and customs officials, to whom he presented his Dominican passport and the newly obtained visa. He answered their questions, had his passport stamped and received “a little piece of cardboard,” which was inserted into the passport. (Tr, Jan. 20, 2012, at 78.)
Upon his return to this country in or about 1986, defendant did not immediately meet with INS officials, however. In the two or three months after his return to the United States, his relationship with his first wife deteriorated, and he learned that the woman who would later become his second wife was pregnant. Given these circumstances, defendant, recognizing that pursuing his application for adjustment of status based on his marriage was untenable and that he had a “responsibility” to the woman who was pregnant with his child (id. at 69), divorced his first wife and abandoned the application.
On or about June 4, 1987, defendant married his second wife, who was not a United States citizen. In July 1987, Burgos *398 submitted a second application for adjustment of his status to LPR, apparently on the basis that his second wife was an LPR, which application was prepared with the aid of an immigration attorney.
On March 10, 1988, defendant, then 23 years old, was arrested in the instant case. As stated above, on September 28, 1988, he was convicted by his plea of guilty of an attempted drug sale, which was entered in full satisfaction of the indictment, and, on November 14, 1988, he was sentenced as stated above.
In December 1988 or January 1989, defendant visited an immigration attorney’s office and was informed that his 1987 application for adjustment of status had been denied for insufficiency of paperwork.
In 1990 or 1991, defendant, together with his second wife, again met with an immigration attorney, who informed him that “because of the problem [he] had,” namely, his drug conviction in the instant case (tr, Jan. 13, 2012, at 49-50), he was not eligible for an adjustment of status and “was supposed to be deported.” (Tr, Jan. 20, 2012, at 84.) He was also told that he “should not get into any trouble because [he] could be deported and that he should not travel.” (Tr, Jan. 13, 2012, at 49-50.)
More than a year after his meeting with the immigration attorney (tr, Jan. 20, 2012, at 136-137), defendant, apparently on the advice of his immigration attorney, went to an unspecified location in Long Island City and was told that his paperwork had been moved to 26 Federal Plaza in Manhattan. He was also told that he would be scheduled for an appointment to go to 26 Federal Plaza and notified accordingly, but he never received any such notice.
B. Defendant’s Arrest and Predisposition Litigation of the Instant Case
On March 10, 1988, defendant was arrested and charged with one count of criminal sale of a controlled substance in the third degree (Penal Law § 220.39 [1]) and one count of criminal possession of a controlled substance in the third degree (Penal Law § 220.16) for having sold a controlled substance to an undercover officer participating in a buy and bust operation. Specifically, according to the People, defendant approached the undercover officer in the vicinity of 515 West 168th Street in Manhattan and asked the officer what she wanted, and the officer replied, “One,” meaning one tinfoil of cocaine. Defendant then reached into the hole of a wall of a nearby residential building, removed *399 a tinfoil containing cocaine and handed it to the officer in exchange for $50 in United States currency. Defendant was arrested by the backup team, which recovered two additional tinfoils of cocaine from the hole in the wall. Defendant was arrested within minutes after the transaction and, five minutes after the transaction, the undercover officer conducted a confirmatory identification identifying defendant as the seller. No cocaine or prerecorded buy money was found on defendant’s person (tr, Jan. 13, 2012, at 16-17; People’s exhibit 3, Organized Crime Control Bureau Buy Report, dated Mar. 10, 1988).
Defendant’s account of the facts, as derived from his testimony, is that on the night of his arrest he was sitting at an unattended security guard desk in the lobby of his friend’s residential building making a sign for his friend when police arrived and arrested him along with others who were present (tr, Jan. 13, 2012, at 15). Once in the car, he encountered another man who had been arrested who told him that the police “are everywhere because they are looking for somebody who looks like you.” (Id. at 16.) Thus, defendant contends that he was mistakenly identified as the perpetrator.
I credit defendant’s uncontroverted testimony that he had made his defense counsel aware of his misidentification defense early in the case and that, prior to entering his guilty plea, he had informed his attorney of his lack of legal immigration status. (See tr, Jan. 20, 2012, at 103.)
C. Immigration Law at the Time of Defendant’s Plea
I take judicial notice that at the time of defendant’s plea in 1988, the following pertinent provisions of the Immigration and Nationality Act (INA), all of which had been in effect since the enactment of the INA in 1952 and have remained essentially unchanged, and all of which, unlike those provisions applicable to an LPR such as the petitioner in Padilla, apply to undocumented immigrants: 8 USC § 1227 (a) (2) (B) (i), which provides for mandatory deportation of an undocumented noncitizen convicted of a controlled substance offense; 8 USC § 1182 (a) (2) (A) (i) (II), which bars from eligibility for an immigrant visa or admittance to the United States for permanent residence an undocumented immigrant convicted of a controlled substance offense; and 8 USC § 1255 (a) (2), which disallows adjustment of status to LPR for an undocumented immigrant who is otherwise inadmissible. In addition, in 1988, former 8 USC § 1254 (a), which disallowed suspension of deportation, as it was then known, to an undocumented immigrant convicted of a controlled *400 substance offense, was also in effect. These INA provisions form the basis for the immediate immigration consequences to defendant of his plea of guilty to a controlled substance offense in the instant case.
D. Defendant’s Plea Negotiations and Subsequent Events
With respect to whether plea counsel informed defendant of the immigration consequences of his plea, the People make much of the fact that Daly-Rivera had written a letter to the assigned prosecutor shortly before defendant entered his guilty plea stating that he had discussed “every possible facet” of the proposed plea agreement with defendant and was “confident” that the case would be resolved at the next court appearance. (People’s exhibit 2, letter from Victor G. Daly-Rivera, Esq. to Kathleen Sullivan, Esq., dated Aug. 25, 1988 [1988 letter]; tr, Feb. 17, 2012, at 156.) During his testimony, however, DalyRivera had no recollection of the meaning of the quoted phrase (tr, Feb. 17, 2012, at 160), nor of any conversations he had had with defendant in preparation for the plea. (Id. at 147.) He could not recall whether he had advised defendant of the immigration consequences of his plea (id.), nor what his general practices were in 1988 regarding advisement of clients as to the immigration consequences of their pleas. (Id. at 153.) He could only offer that the letter was “unusual,” and that “there had to have been something” which occasioned its writing. (Id. at 160.) He also had no recollection of what he had meant by the phrase “every possible facet” in the 1988 letter. (Id. at 160.) He also testified that while he then had a criminal practice with numerous Spanish-speaking clients born outside this country, he “probably did not focus” on their immigration status in 1988. (Id. at 162.) Daly-Rivera candidly stated that he had no particular understanding of the immigration consequences of a criminal conviction at the time (id. at 163), probably did not take any continuing legal education courses in immigration law in the 1980s (id. at 165) and probably did not inquire into the immigration status of any of his criminal clients, including defendant, in the 1980s. (Id. at 162.) Given plea counsel’s doubts about the limits of his own knowledge of and practices with respect to immigration law at the time, and given his lack of memory of his representation of defendant itself (id. at 146-148), I find defendant’s recollection that his plea counsel did not advise him concerning the deportation or other immigration consequences of his plea reflects the more likely scenario. Defendant’s sole experience with plea negotiations would be far more memorable *401 to him than to his plea counsel, who routinely participated in numerous such negotiations over the years.
Thus, notwithstanding defendant’s statement in his 1988 letter that he covered “every possible facet” of the proposed plea agreement with defendant, I find that defendant’s discussions with his plea counsel covered only the criminal law aspects of his plea and included no advice to defendant as to any of the immigration consequences of his plea.
On September 28, 1988, approximately two months after having filed his second adjustment of status application, which was then pending, defendant pleaded guilty to a controlled substance offense, unaware of the immigration consequences of so doing. Although he believed himself not guilty, given defense counsel’s advice that the jury might not believe his testimony and that he could face two-to-six years’ imprisonment (tr, Jan. 13, 2012, at 20), after “intense discussions” with his wife (tr, Jan. 20, 2012, at 118), he pleaded guilty in reliance upon the promise of a nonincarceratory sentence in order to avoid the risk of being separated from his family by imprisonment. (Tr, Jan. 13, 2012, at 22.)
I reject the People’s argument that plea counsel may have referred defendant to an immigration attorney. Given the primacy of defendant’s preexisting plan to legalize his status and remain in this country, and the “intense discussions” with his wife about the plea, defendant almost certainly would have accepted the referral and consulted with such an attorney, had his plea counsel suggested that he do so. Further, he would have remembered such a consultation. The People’s position is based upon nothing more than sheer speculation, as there is no evidence whatsoever that defendant’s plea counsel made any such referral.
E. Family and Employment History
Defendant and his second wife have three children: a son, Franly, born in 1987, who was one year old at the time of defendant’s guilty plea; a daughter, Nercy, born in 1988, with whom defendant’s wife was pregnant at the time of defendant’s guilty plea; and a daughter, Jasmine, born in 1992. All three of defendant’s children are United States citizens and have resided in this country since birth. In addition, defendant has been employed in New York City as a clothing salesperson and tailor (tr, Jan. 13, 2012, at 12-13) and, for the past 12 years, at El Padrinito, a pawn shop originally owned by defendant’s uncle. (Id. at 28; tr, Jan. 20, 2012, at 89.)
*402 F. Subsequent Criminal History
According to defendant, he was arrested as the result of a domestic incident occurring in the 1990s, possibly in 1998, in which a complainant other than defendant’s second wife called the police. (Tr, Jan. 20, 2012, at 92.) Defendant appeared before a judge, but defendant’s wife also appeared and stated that defendant had not assaulted her and the case was ultimately dismissed. (Id.) The case does not appear in defendant’s criminal history record.
III. Conclusions of Law
A. Applicable Legal Standards
1. Procedural Standard
At a hearing held pursuant to CPL 440.30 (5), the defendant has the burden of proving by a preponderance of the credible evidence every fact essential to support every element of his claims (CPL 440.30 [6]).
2. Constitutional Right to Counsel Standards
‘‘[C]riminal defendants require effective counsel during plea negotiations. Anything less . . . might deny a defendant effective representation by counsel at the only stage when legal aid and advice would help him.” (Missouri v Frye, 566 US —, —, 132 S Ct 1399, 1407-1408 [2012] [internal quotation marks and citations omitted].) Indeed, “the decision to plead guilty, and thereby forfeit many of the rights guaranteed by the United States and New York Constitutions, ‘is ordinarily the most important single decision in any criminal case.’ ” (People v Picea, 97 AD3d at 177 [citations omitted].) Thus, a defendant is entitled to effective assistance of counsel “[b]efore deciding whether to plead guilty.” (Padilla v Kentucky, 559 US at —, 130 S Ct at 1480.)
a. Federal Constitutional Standard
In order to establish a constitutional violation under the Federal Sixth Amendment standard, a defendant must satisfy a two-pronged test, demonstrating first that “counsel’s representation fell below an objective standard of reasonableness” (Strickland v Washington, 466 US 668, 688 [1984]) and second, that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” (Id. at 694; People v Turner, 5 NY3d 476, 480 [2005].)
*403 i. Objective Standard of Reasonableness
The Supreme Court has explained that “the reasonableness of counsel’s challenged conduct on the facts of the particular case [must be] viewed as of the time of counsel’s conduct . . . [based upon then] prevailing professional norms.” (Strickland v Washington, 466 US at 690.) In determining whether a defense counsel’s representation of a defendant at the time of a plea met an objective standard of reasonableness, “courts must take into account all the information counsel knew or should have known” at the time of the defendant’s plea. (Roe v Flores-Ortega, 528 US 470, 480 [2000].)
With respect to meeting the objective standard of reasonableness for immigrant clients, the Supreme Court in Padilla articulated a two-tiered standard. Where the law pertaining to the deportation consequences of a guilty plea is “truly clear,” the Court explained, the duty of a defense counsel to offer to a noncitizen client “correct advice” as to those consequences is “equally clear.” (Padilla v Kentucky, 559 US at —, 130 S Ct at 1483.) But “[w]hen the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences.” (Id.)
ii. Prejudice
Furthermore, to satisfy Strickland’s prejudice requirement in the context of a claim of ineffective assistance in connection with a guilty plea, the defendant “must show that there is a reasonable probability that, but for counsel’s errors, he would not have pleaded guilty and would have insisted on going to trial.” (Hill v Lockhart, 474 US 52, 59 [1985]; People v McDonald, 1 NY3d 109, 115 [2003].) Further, the “petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.” (Padilla v Kentucky, 559 US at —, 130 S Ct at 1485, citing Roe v Flores-Ortega, 528 US at 480.)
In applying the Padilla standard, a court need “not determine whether a decision to reject a plea of guilty was the best choice, but only whether it is a rational one.” (People v Picca, 97 AD3d at 185; see United States v Orocio, 645 F3d 630, 643 [3d Cir 2011] [“The Supreme Court . . . requires only that a defendant could have rationally gone to trial in the first place, and it has never required an affirmative demonstration of likely acquittal at such a trial as the sine qua non of prejudice”], citing Hill v Lockhart, 474 US at 59.) Rather, all that a defendant need demonstrate is that “a decision to reject the plea offer, and take a *404 chance, however slim, of being acquitted after trial would have been rational.” (People v Picca, 97 AD3d at 184-185, citing United States v Orocio, 645 F3d at 643-646.) In making this determination, “[t]he rationality standard set by the United States Supreme Court in Padilla does not allow the courts to substitute their judgment for that of the defendant.” (People v Picca, 97 AD3d at 185.)
Because removal from the United States “can be the equivalent of banishment or exile” (Delgadillo v Carmichael, 332 US 388, 391 [1947]), deportation is “a particularly severe penalty.” (Padilla v Kentucky, 559 US at —, 130 S Ct at 1481 [internal quotation marks omitted].) Indeed, especially for an undocumented immigrant who has resided in this country for a substantial period of time, the “stakes are . . . high and momentous.” (Delgadillo v Carmichael, 332 US at 391.) Therefore, because “[preserving the client’s right to remain in the United States may be more important to the client than any potential jail sentence” (Padilla v Kentucky, 559 US at —, 130 S Ct at 1483, quoting I.N.S. v St. Cyr, 533 US 289, 322 [2001]), a thorough evaluation of the circumstances in which noncitizen criminal defendants find themselves at the time of the plea is warranted. (See People v Picca, 97 AD3d at 183-184.)
The motion court must consider both the legal circumstances and the social circumstances in making its determination. The legal factors include the strength of the prosecution’s evidence, the availability of any defenses, the likelihood of a conviction were the defendant to proceed to trial, defense counsel’s advice on the plea offer, and a comparison of the promised sentence after a guilty plea with the potential exposure upon a guilty verdict (the McDonald legal factors). (People v McDonald, 296 AD2d 13, 20 [3d Dept 2002], affd 1 NY2d 109 [2003].) In addition, the thorough evaluation required by Picea requires the court to consider factors such as the contemporaneous presence of family members in the United States, contrasted with the extant family in defendant’s country of origin; defendant’s employment history in both countries; any steps defendant had taken prior to the guilty plea to remain legally in this country; defendant’s frequency of travel to his or her country of origin; any relevant statements by the defendant to the court, to the Department of Probation or to plea counsel; and any other facts or circumstances evincing the primacy of the defendant’s desire to remain in the United States (the Picca social factors). (See e.g. United States v Couto, 311 F3d 179, 188 n 9 [2d Cir 2002] *405 [“(A)s soon as (the defendant) learned the deportation consequences of her plea, she immediately sought to withdraw it”]; People v De Jesus, 34 Misc 3d 748, 765 [Sup Ct, NY County 2011] [expression of misgivings about immigration consequences immediately following entry of guilty plea; seeking immigration advice immediately after being stopped at airport upon reentry to United States].)
b. State Constitutional Standard
i. Meaningful Representation
Article I, § 6 of the New York State Constitution similarly guarantees a criminal defendant the effective assistance of counsel. This standard is flexible and “[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met. . . .” (People v Baldi, 54 NY2d 137, 147 [1981].) An attorney is presumed to have provided “meaningful representation,” and the burden of proving otherwise rests with the defendant. (People v Hobot, 84 NY2d 1021, 1022 [1995].) “In the context of a guilty plea, a defendant has been afforded meaningful representation when he or she receives an advantageous plea and nothing in the record casts doubt on the apparent effectiveness of counsel . . . .” (People v Ford, 86 NY2d 397, 404 [1995] [citations omitted].) The defendant must demonstrate that “the alleged ineffective assistance had [an] impact on the plea bargaining process or the voluntariness of the plea.” (People v Dunn, 261 AD2d 940, 940 [4th Dept 1999], lv denied 94 NY2d 822 [1999].)
ii. Prejudice as a Factor
While the Baldi standard requires only an inquiry as to whether a defendant received “meaningful representation,” this does not mean that prejudice is irrelevant under the New York standard. It is regarded “as a significant but not indispensible element in assessing meaningful representation.” (People v Stultz, 2 NY3d 277, 284 [2004].) Under the state standard, the “ ‘prejudice component focuses on the “fairness of the process as a whole rather than its particular impact on the outcome of the case.” ’ ” (People v Feliciano, 17 NY3d 14, 20 [2011], quoting People v Caban, 5 NY3d 143, 156 [2005], quoting People v Benevento, 91 NY2d 708, 714 [1998].)
B. Analysis of Defendant’s Padilla Claim
On this motion, defendant contends that his plea counsel violated his rights under Padilla by ineffectively failing to advise *406 him that his plea of guilty to a controlled substance offense would render him deportable without any hope of changing his status to LPR. In order to prevail on this claim, defendant must prove by a preponderance of the credible evidence, that his counsel failed properly to advise him as to the immigration consequences of his plea; under the federal standard, that his failure to do so did not meet an objective standard of reasonableness as governed by prevailing professional norms at the time of the plea; and that, had he received proper advice from his counsel, a rational person in defendant’s position would have rejected the plea offer and proceeded to trial. To prevail under the state constitutional standard, defendant must demonstrate that his counsel’s failure to render proper advice overcomes the presumption that he received meaningful representation from his plea counsel, taking into account the fairness of the process as a whole.
1. Federal Constitutional Standard
a. Objective Standard of Reasonableness
In determining whether counsel’s failure to advise defendant of the immigration consequences of his plea was consistent with prevailing professional norms then extant, it is not sufficient to say that because the conventional wisdom among defense attorneys at the time was that, in accordance with the actual practice of the INS, defendants receiving probationary sentences would not be detained and deported, or that because attorneys at that time did not provide deportation advice to their clients who entered guilty pleas to controlled substance offenses, the prevailing professional norm was that no such advice was required. Rather than embracing a descriptive standard, the prevailing professional norm for Strickland purposes is the normative, or aspirational standard, derived from the clear mandate of the statute governing the deportation consequences of a plea and the views expressed in bar association standards, treatises, guidelines and other authorities. (Padilla v Kentucky, 559 US at —, 130 S Ct at 1482 [“We long have recognized that ‘(p)revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable”], quoting Strickland v Washington, 466 US at 688; People v De Jesus, 30 Misc 3d 1203[A], 2010 NY Slip Op 52259[U], *14 n 10 [Sup Ct, NY County, Dec. 24, 2010].)
The law governing the deportation consequences of a guilty plea, namely, the Immigration and Nationality Act, has remained essentially unchanged since its enactment in 1952, *407 with respect to an individual in defendant’s position. Thus, since 1952, a noncitizen undocumented immigrant convicted of a controlled substance offense is rendered deportable by virtue of that conviction (8 USC § 1227 [a] [2] [B] [i]), ineligible for lawful admittance or for a visa to enter the United States (8 USC § 1182 [a] [2] [A] [i] [II]) and ineligible for an adjustment of immigration status to that of an LPR (8 USC § 1255 [a] [2]).
Furthermore, treatises dating back to 1982, six years before defendant entered his plea in the instant case, support the concept that defense attorneys have an affirmative duty to advise criminal defendants of the immigration consequences of their pleas (see 3 Bender’s Criminal Defense Techniques, § 60A.01 [1985]; 3 ABA Standards for Criminal Justice 14-3.2 Comment, 75 [2d ed 1982]; and James E. Bond, Plea Bargaining & Guilty Pleas § 3.46 [1982]). Each of these authorities had been published by the time of the defendant’s plea in this case.
Thus, in this case, by the time of defendant’s guilty plea in 1988, the enactment of the relevant provisions of the INA had made truly clear and unambiguous since 1952 that by pleading guilty to a controlled substance offense, an undocumented immigrant who had entered the country illegally would be immediately rendered deportable without any recourse to an adjustment of his immigration status to that of an LPR. Similarly, as contrasted with LPRs, suspension of deportation was unavailable to those undocumented immigrants who had pleaded guilty to such offenses. (See former 8 USC § 1254 [a] [1], [2].) Accordingly, the clarity of the law at the time of defendant’s plea triggered plea counsel’s higher duty under Padilla to give correct advice to defendant as to the deportation consequences of that plea. (Padilla v Kentucky, 559 US at —, 130 S Ct at 1483.)
In any event, even if the INA provisions governing defendant’s deportation consequences could reasonably be characterized as less than clear, Padilla requires that its second tier, lesser duty be fulfilled. (See Padilla v Kentucky, 559 US at —, 130 S Ct at 1483.) Thus, at minimum, plea counsel should have met that second tier standard by warning defendant generally that by pleading guilty, he may have been risking adverse immigration consequences.
Furthermore, in this case, there is no question that deportation was a direct consequence of defendant’s guilty plea. Defendant’s plea to a drug felony immediately and permanently deprived him of any avenue by which he could avoid deporta *408 tion, namely, by seeking an adjustment of status to that of an LPR or by cancellation of removal. The elimination of defendant’s eligibility for these remedies rendered defendant subject to deportation without recourse, and therefore had direct deportation consequences for him. Thus, defendant’s claim in this case is within the scope of Padilla. (See n 3, infra.)
Nonetheless, the People argue that loss of eligibility for adjustment of status is not the same as deportation. The People’s argument misses the mark as to what is at issue here, however. Just as a plea of guilty to an aggravated felony by an LPR, while eliminating the possibility of cancellation of removal under the law in effect since the enactment of Illegal Immigration Reform and Immigrant Responsibility Act in 1996 (IIRIRA), does not necessarily result in the LPR’s immediate removal (see 8 USC § 1229b [a] [3] [noncitizen convicted of aggravated felony ineligible for cancellation of removal]), so a plea of guilty by an undocumented immigrant to a controlled substance offense after the enactment of the INA in 1952, while eliminating the possibility of avoiding mandatory removal (see 8 USC § 1227 [a] [2] [B] [i] [mandatory deportation for noncitizens convicted of controlled substance offense]; 8 USC § 1182 [a] [2] [A] [i] [II] [barring from eligibility for admittance or visa noncitizens convicted of controlled substance offense]; 8 USC § 1255 [a] [2] [disallowing adjustment of status to LPR for an undocumented noncitizen who is otherwise inadmissible] [collectively, the three INA provisions]), does not necessarily result in the immediate removal of the undocumented immigrant.
Here, defendant complains that his plea counsel never advised him that his guilty plea “would presumptively result in [his] permanent banishment from the United States, and would render [him] permanently ineligible for lawful permanent residence in the United States.” (Aff of defendant, sworn Mar. 18, 2011, H 4.) In this case, defendant’s guilty plea to a drug conviction immediately and permanently deprived him of any avenue by which he could avoid deportation and remain in this country legally. The elimination of defendant’s eligibility for these remedies rendered defendant subject to deportation without recourse, and therefore had direct deportation consequences for him.
Furthermore, because 8 USC § 1227 (a) (2) (B) (i) provides for deportation of any noncitizen immigrant convicted of a controlled substance offense, a conviction of such an offense rendered the convicted immigrant automatically deportable. Thus, even if removal has not in fact occurred in a particular *409 case, deportation is, nevertheless, a direct consequence of the conviction. Therefore, in this case, deportation was a direct consequence of defendant’s guilty plea.[3]
Next, the People assert that this court is bound to follow the decision of the Appellate Term, First Department in People v Feliciano (31 Misc 3d 128[A], 2011 NY Slip Op 50471[U] [App Term, 1st Dept 2011], lv denied 16 NY3d 894 [2011]), in which that court held that prevailing professional norms in 1988 did not require a defense counsel to advise an undocumented immigrant of the immigration consequences of a guilty plea (2011 NY Slip Op 50471[U], *1). There are significant differences between the decisions of the Appellate Term, which are not binding on this court, and those of the Appellate Division, which are binding on this court even if issued by that court in another judicial department, however. (See People v Turner, 5 NY3d 476, 482 [2005] [Appellate Division, Third Department decision is “a valid precedent, binding on all trial-level courts in the state”]; Nachbaur v American Tr. Ins. Co., 300 AD2d 74, 76 [1st Dept 2002], lv denied 99 NY2d 576 [2003], cert denied 538 US 987 [2003] [Appellate Division, Second Department decision “unless . . . overruled or disagreed with by this Court, is ‘controlling’ authority”]; Mountain View Coach Lines v Storms, 102 AD2d 663, 664-665 [2d Dept 1984] [“(T)he doctrine of stare decisis requires trial courts in this department to follow precedents set by the Appellate Division of another department until the Court of Appeals or this court pronounces a contrary rule” (citations omitted)].) Indeed, courts of coordinate jurisdiction have concluded that decisions of the Appellate Term are not binding on the Supreme Court, even within the same judicial department. (See People v Garcia, 21 Misc 3d 732, 739 [Sup Ct, Bronx County 2008] [“The opinions of the Appellate Term are not binding on this court. They are merely persuasive authority”]; 29 Holding Corp. v Diaz, 3 Misc 3d 808, 816 [Sup Ct, Bronx County 2004] [“(L)ogically, (Appellate Term) determinations would have less binding authority on the Supreme Court, which is not subject to the appellate jurisdiction of the Appellate Term”].)
Although not dissimilar to the Appellate Division with respect to its authority to review the decisions of certain lower courts, *410 the Appellate Term has significant differences from the Appellate Division that provide further support for the view that Appellate Term decisions are not binding on this court. For example, unlike the Appellate Division, the Appellate Term has a scope of authority limited to a review of matters “other than appeals from the supreme court.” (NY Const, art VI, § 8 [d]; see also Mears v Chrysler Fin. Corp., 243 AD2d 270, 272 [1st Dept 1997] [“Appellate Term has no power to review a Supreme Court ruling”]; People v Garcia, 21 Misc 3d at 738 [“The Appellate Term shares coordinate jurisdiction with the Supreme Court and may not review a decision from a Supreme Court Justice”].)
Furthermore, unlike both the Supreme Court and the Appellate Division, both of which were created by the legislature, “the Appellate Term was established by and serves at the pleasure of the Appellate Division of the Supreme Court of the department in which it sits.” (People v Pestana, 195 Misc 2d 833, 837 [Crim Ct, NY County 2003], citing NY Const, art VI, §§ 4, 8 [b]; see also NY Const, art VI, § 7 [a].) A Justice of the Appellate Division is appointed by the Governor of New York State, whereas an Appellate Term Justice “is appointed by the Chief Administrator of the Courts, subject to the approval of the Presiding Judge of the Appellate Division.” (People v Garcia, 21 Misc 3d at 738, citing NY Const, art VI, §§ 4 [c], [d], [j]; 8 [d]; see Burgos II at 23-24, citing Pestaña [regarding further differences between the Appellate Division and the Appellate Term].)
Accordingly, this court does not believe itself bound by the decisions of the Appellate Term. For that reason, and because I have previously expressed my own contrary views on the issue of whether prevailing professional norms in or about 1988 required a defense counsel to warn an undocumented immigrant client of the deportation consequences of a guilty plea {see People v Sterling Taylor, Sup Ct, NY County, Oct. 28, 2011, indictment No. 6461/1992, slip op at 23 n 3), this court respectfully declines to follow People v Feliciano.
Next, the People assert that defense counsels are not required to advise noncitizen criminal defendants as to hypothetical paths to permanent residence. Here, for the reasons stated above, the immigration consequences to defendant in this case, including mandatory deportation with no possibility of suspension of deportation or adjustment of status, are direct, and are no more hypothetical than those faced by LPRs convicted of ag *411 gravated felonies after the passage of IIRIRA. (See e.g. Padilla v Kentucky, People v De Jesus, 34 Misc 3d at 769 [defendant faced deportation pursuant to 8 USC § 1227 (a) (2) (A) (iii) due to her plea of guilty to an aggravated felony].) The three INA provisions, therefore, also involve the actual and direct consequence of unavoidable removal.[4]
The People also maintain that Padilla is inapplicable here because cancellation of removal for LPRs was discretionary in 1988. As defendant was not an LPR at the time of his plea, this argument is inapposite.
To the extent that the People contend that plea counsel had no duty to inform defendant of the immigration consequences of his plea because defendant never informed his counsel that he was not an LPR, this argument is both factually baseless, given this court’s findings, and clearly legally meritless, in light of Picea. The argument is premised upon the assumption that at the time of his plea, defendant understood that his immigration status would be affected by the criminal proceedings. As the Appellate Division, Second Department stated in Picea, however:
“[T]o require that defendants apprehend the relevance of their noncitizenship status, and affirmatively provide this information to counsel, would undermine the protection that the Padilla Court sought to provide to noncitizen defendants. Indeed, it would lead to the absurd result that only defendants who understand that criminal convictions can affect their immigration status would be advised of that fact.” (People v Picca, 97 AD3d at 179.)
In this case, the credible evidence from both witnesses at the hearing is that, notwithstanding applicable law which was well-settled at the time of defendant’s plea, defendant was not advised that his conviction for attempted criminal sale of a controlled substance in the third degree would constitute a controlled substance offense under the INA, subjecting him to mandatory deportation, without the possibility of adjustment of *412 status or, as it was then known, suspension of deportation (see former 8 USC § 1254 [a] [repealed Sept. 30, 1996 and superseded by cancellation of removal pursuant to 8 USC § 1229b (a) (3)]). Thus, plea counsel failed in his duty, under prevailing professional norms of the time, to render proper advice to defendant of the immigration consequences of his plea, under either tier of the Padilla standard.
Therefore, defendant has demonstrated that his plea counsel’s performance fell below the objective standard of reasonableness according to professional norms and the first segment of the Strickland standard is satisfied.
b. Prejudice
In applying the first prong of the Roe two-prong test for prejudice,[5] namely, the rational basis inquiry, to the facts of this case, this court must examine all of the particular circumstances relevant to defendant’s choice of going to trial or taking a plea at the time the decision was made. (People v Picca, 97 AD3d at 183-184.)
Initially, examination of the McDonald legal factors demonstrates that the prosecution’s case was not impermeable, in that the case involved an undercover hand-to-hand transaction without recovery of any prerecorded buy money or drugs from the person of the defendant. At minimum, the failure to recover these items undermined the People’s case, and would have permitted defendant to argue, in his defense, as he did at the hearing, that he was mistakenly identified as the seller.
The next factor to be considered is the likelihood of conviction were the defendant to proceed to trial. Although there would have been police testimony at trial to the effect that two tin packages were recovered from the hole in the wall from which defendant extracted the tin he sold to the undercover officer, given that no drugs or prerecorded buy money were recovered from defendant, the strong possibility nonetheless existed that defendant would have been acquitted at least of the sale count, and perhaps of the possession count, had he proceeded to trial. In any event, as previously explained, defendant need not demonstrate a likelihood of success at trial, but merely that given the totality of his circumstances, “a deci *413 sion to reject the plea offer, and take a chance, however slim, of being acquitted after trial, would have been rational.” (People v Picca, 97 AD3d at 184-185, citing United States v Orocio, 645 F3d 630, 643-646.)
With respect to any advice rendered to defendant by plea counsel at the time of the plea, plea counsel merely testified that he recalled nothing regarding any aspect of his representation of defendant. The only evidence as to what took place in the course of plea negotiations other than defendant’s testimony was the ambiguous language of Daly-Rivera’s preplea 1988 letter, which is silent regarding any issues relating to defendant’s immigration status.
Comparison of the promised sentence (time served and five years’ probation) with defendant’s potential exposure after a guilty verdict (likely the minimum indeterminate sentence of 1 to 3 years’ imprisonment, as a first offender convicted of a single instance of selling a small quantity of narcotics, rendering him eligible for parole after service of the minimum sentence of one year) demonstrates that the avoidance of the likely sentence at trial would not necessarily have compelled defendant to plead guilty to a controlled substance offense, had he known of the immigration consequences of that plea. Rather, pursuing a course which afforded the possibility, even if not particularly strong, of maintaining his right to remain in the United States, via an acquittal at trial, may well have been more desirable to him than accepting the certainty of being subject to permanent banishment upon conviction by guilty plea, even though a trial carried with it the risk of a minimum of 1 to 3 years in state prison, should he be convicted. (Padilla v Kentucky, 559 US at —, 130 S Ct at 1483; I.N.S. v St. Cyr, 533 US at 322.)
The social factors which Picea compels the court to examine establish that at the time of his guilty plea, defendant was married to his second wife, who was a lawful permanent resident. The couple were the parents of a one year old and were expecting their second child within a few months; both of whom received United States citizenship at their birth. There is no evidence that defendant maintained any contact with any family members in the Dominican Republic. At the time of his plea, he had been working in New York City as a clothing salesman and a tailor over the course of four years, having left behind a life of abject poverty in the Dominican Republic, where he had little, if any, employment prospects.
With respect to any steps defendant took to remain legally in this country prior to pleading guilty in 1988, the significance to *414 defendant of the right to remain in this country loomed quite large at that time. Indeed, at the time of his plea, he had already demonstrated his intention to make this country his home by twice commencing the process of applying to remain in the United States legally and permanently. In 1988, he had resided in the United States for most of the preceding four years, never having returned to the Dominican Republic, and having left this country for only one week in 1986 to travel to Mexico for the sole purpose of obtaining a valid visa for himself in furtherance of his first application for legal permanent residency in the United States. He abandoned that first application only because he felt compelled to do so by the collapse of his relationship to his first wife and an overriding sense of responsibility to the woman who would become the mother of the child he had at the time of his plea.
Furthermore, undaunted by the abandonment of that application, defendant, having married his second wife, submitted a second application in July 1987. Thus, at the time of his plea, defendant had been consistently working for the preceding two years to legalize his status so that he could remain in this country. His actions subsequent to the plea, in persisting to secure legal status, similarly demonstrate his concern with avoiding deportation.
All of these efforts by defendant demonstrate the importance to defendant of remaining in this country, where he has enjoyed both a family life and the prospects of long-term employment. By contrast, defendant has no demonstrated family ties or economic incentive to return to his country of origin, the Dominican Republic. As his actions over the years have demonstrated, for defendant, what mattered most to him was finding a way to remain in the United States with his family, lawfully and permanently.
Nonetheless, the People argue that defendant was not prejudiced by any failure of plea counsel to advise him of the deportation consequences of his plea because defendant was already subject to deportation at the time he pleaded guilty. In weighing whether a defendant has suffered prejudice under Padilla, prior indicia of deportability “are but factors in [the] calculus,” however. (People v Picca, 97 AD3d at 183.) For a citizen criminal defendant, the strength of the People’s evidence and the potential sentence in the event of conviction likely bear the greatest weight in a decision of whether to accept a plea offer. (Id.) By contrast, for a noncitizen criminal defendant, re *415 moval from the United States is “the equivalent of banishment or exile” (Delgadillo v Carmichael, 332 US at 391) and is “a particularly severe penalty” (Padilla v Kentucky, 559 US at —, 130 S Ct at 1481 [internal quotation marks omitted]), avoidance of which may well be of “primary importance.” (People v Picca, 97 AD3d at 183.) Moreover, if the People’s view were correct, only LPRs in good standing with no prior controlled substance offense or aggravated felony convictions would have Sixth Amendment rights to effective counsel under Padilla.
The People also argue that had defendant rejected the plea and proceeded to trial, even the best outcome from defendant’s perspective, namely, a full acquittal after trial, would not have automatically guaranteed defendant an immigrant visa under INA § 245 (i) (8 USC § 1255 [i]) and adjustment of his status, or even consular processing. To establish that he was prejudiced, however, defendant need not demonstrate that he would have been certain to avoid the possibility of deportation had he rejected the plea and proceeded to trial. All that need be shown is that the choice to fight the case would have been a rational one.
In sum, at the time of his plea: the case against defendant was not the strongest, given that no cocaine or prerecorded buy money was recovered from his person at his arrest; he would have had defenses available to him at trial; acquittal after trial was at least a reasonable possibility; defense counsel failed to advise defendant of the immigration consequences of his plea under either of the Padilla standards; and defendant likely would have received a minimal prison sentence had he been convicted after a trial. In addition, at the time of his plea: defendant was married to a woman who was a legal permanent resident; had an infant son who was a citizen of the United States and another one on the way; was gainfully employed in this country; and had no known family ties to the Dominican Republic or employment prospects there, having left it four years before his conviction; had twice applied for an adjustment of his status, on one occasion, leaving the country to do so; and had never returned to his country of origin. Put simply, a rational defendant under these circumstances “could have been more concerned about a near-certainty of multiple decades of banishment from the United States than the possibility of [less than] a single decade in prison.” (United States v Orocio, 645 F3d at 645; see Padilla v Kentucky, 559 US at —, 130 S Ct at 1483; I.N.S. v St. Cyr, 533 US at 322.) Thus, in this case, plea *416 counsel’s failure to warn defendant of “the dire immigration consequences that flowed from his decision to plead guilty” resulted in prejudice to him. (People v Picca, 97 AD3d at 185-186.)
For all of these reasons, this court finds that, under all the circumstances at the time of defendant’s plea as presented in this case, defendant has met his burden of demonstrating a reasonable probability that he would not have entered the plea and would have insisted on going to trial absent his plea counsel’s ineffective assistance by showing that a rational defendant in his position would have done just that. (Padilla v Kentucky, 559 US at —, 130 S Ct at 1485, citing Roe v Flores-Ortega, 528 US at 480.) Accordingly, this court finds that defendant has established by a preponderance of the evidence his claim of prejudice under the second prong of Strickland, and entitlement to vacation of the judgment on the ground of ineffective assistance of counsel under the Sixth Amendment. Therefore, to the extent that this motion rests on federal constitutional grounds, it is granted. (GPL 440.30 [6].)
2. State Constitutional Standard
Viewing the process of counsel’s representation of defendant as a whole, as of the time of the representation, the evidence presented demonstrates that although counsel secured a favorable, nonincarceratory plea bargain for defendant, he did so without any full consultation with him about the consequences of his plea. Given defendant’s focus at the time of the representation on establishing a life for himself and his family in the United States, and maintaining his employment opportunities in this country, which far exceeded those in his country of origin, counsel’s shortcomings were serious enough to deprive his client of the meaningful representation to which he was entitled under the State Constitution. (See People v Turner, 5 NY3d at 480 [“a single failing in an otherwise competent performance is so egregious and prejudicial as to deprive a defendant of his constitutional right” (internal quotation marks omitted)].) In view of the particular circumstances of this case at the time of plea counsel’s representation of defendant, viewed in their totality (People v Baldi, 54 NY2d at 147), and in light of the lack of fairness of the process as a whole to defendant (People v Feliciano, 17 NY3d at 20; People v Stultz, 2 NY3d at 284), the court concludes that defendant has met his burden of demonstrating, by a preponderance of the evidence, that he did not receive meaningful representation and *417 was denied effective assistance of counsel, which also had an effect on the voluntariness of his plea. (People v Baldi, 54 NY2d at 147; People v Hobot, 84 NY2d at 1022; People v Dunn, 261 AD2d at 940.) To the extent that his motion to vacate the judgment rests on state constitutional grounds, it is, therefore, granted. (CPL 440.30 [6].)
IV Conclusion
For the reasons stated, defendant’s motion to vacate the judgment entered on November 14, 1998 is granted on grounds of ineffective assistance of counsel under the Federal and State Constitutions. The parties are directed to present themselves to the court for the scheduling of a trial date.

. Knowledge of the factual and procedural background of this case, to the extent that it is set forth in the written decision and order of this court in Burgos II, is presumed.

. Although the People argue that defendant had a strong motive to lie, in that he seeks vacation of judgment in order to avoid deportation and attain legal status, his credibility was enhanced by his having candidly admitted during his testimony that he had had an adulterous relationship and that he had registered his business in his son’s name in order to avoid detection by the authorities.

. The court therefore has no occasion to address the People’s argument that because deportation is a “unique” consequence of a guilty plea entered by a noncitizen defendant, Padilla applies only to deportation, and not to any other possible collateral immigration consequences. (See Padilla v Kentucky, 559 US at —, 130 S Ct at 1481-1482.)

. Contrary to the People’s position, these deportation consequences are not analogous to those of registration under the Sex Offender Registration Act, which were deemed collateral in People v Gravino (14 NY3d 546 [2010]), or to the consequences of civil forfeiture. Neither are they similar to the consequence of inability to renew lawful permanent resident status or to attain United States citizenship, discussed in People v D’Pierre (Sup Ct, NY County, Mar. 13, 2012, indictment No. 1966/92), also cited by the prosecution.

. No analysis of the second prong of the Roe standard is necessary in this case, as there are no factual allegations to the effect that defendant reasonably demonstrated to his counsel, at the time of his plea, that he was interested in rejecting the plea and proceeding to trial. (See Roe v Flores-Ortega, 528 US at 480.)